UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ZEBRA STRATEGIES, INC.,                                :

                                                       :       OPINION AND ORDER
                               Plaintiff,                      24 Civ. 04146 (GWG)

                                                       :

        -v.-

                                                       :
ADA GONZALEZ-NAZARIO,
SEAN GOODMAN, SAGO INC.,                               :
ACCURATE MARKET RESEARCH,
JOHN AND JANE DOES 1-10,                               :
and ABC CORPORATIONS 1-10,

                                                       :

                               Defendants.             :
--------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

        Plaintiff Zebra Strategies, Inc. ("Zebra Strategies" or "Zebra") brought this suit against

defendants Ada Gonzalez-Nazario (also referred to as "Nazario" or "Nazarro" in the complaint),

Sago Inc. ("SAGO"), Sean Goodman, Accurate Market Research ("AMR"), John and Jane Does

1-10, and ABC Corporations 1-10, alleging violations of 18 U.S.C. § 1836, breach of contract,

conversion, breach of duty of loyalty, civil conspiracy, and unfair competition.  See First

Amended Complaint, filed July 16, 2024 (Docket # 53) ("Am. Compl.").  Defendants Goodman

and AMR have each filed motions to dismiss the complaint.[1]  Pro se defendant Gonzalez-

---

[1]  See Notice of Motion to Dismiss, filed Aug. 2, 2024 (Docket # 59) ("AMR Mot.");
Memorandum of Law of Defendant Advanced Market Research in Support of Motion to Dismiss
First Amended Complaint with Prejudice Pursuant to F.R.C.P. 12(b)(6), filed Aug. 2, 2024
(Docket # 60) ("AMR Mem."); Affirmation of Justin T. Kelton in Support of Motion to Dismiss,
filed Aug. 2, 2024 (Docket # 61) ("Kelton Aff."); Plaintiff's Response to Defendant Accurate
Market Research's Motion to Dismiss, filed Aug. 14, 2024 (Docket # 65) ("Pl. Opp. to AMR");
Reply Memorandum of Law of Defendant Advanced Market Research in Further Support of
Motion to Dismiss First Amended Complaint Pursuant to F.R.C.P. 12(b)(6), filed Aug. 23, 2024
(Docket # 68) ("AMR Reply"); Notice of Motion to Dismiss, filed Aug. 5, 2024 (Docket # 63)
("Goodman Mot."); Memorandum of Law in Support of Motion to Dismiss, filed Aug. 5, 2024

Nazario has "adopt[ed] the argument of" defendant Goodman.  See Order, dated Sept. 4, 2024 (Docket # 70).  For the reasons stated below, AMR's and Goodman's motions to dismiss are granted.  Gonzalez-Nazario's motion to dismiss is denied except with respect to the claims of breach of duty of loyalty and civil conspiracy.

I. FACTS AS ALLEGED IN THE AMENDED COMPLAINT

For purposes of deciding the motions to dismiss, we assume the facts of the complaint to be true.

Zebra Strategies is a "market research and strategy firm" that "specializes in marginalized, vulnerable, and hard-to reach populations."  Am. Compl. at 1.  On September 26, 2023, "Participant 1," an individual who had "signed up with and agreed to share private information with . . . Zebra Strategies, and only Zebra Strategies," transmitted "an email she received . . . to participate in a study crafted by SAGO," a research and marketing firm that is one of Zebra Strategies' "main competitors."  Id. ¶¶ 4, 14, 14 n.1.  Participant 1 expressed concern that "her information was being shared by Zebra" and "was adamant that she had not provided her information to any other business."  Id. ¶¶ 14, 16.  Zebra Strategies "immediately launched an internal investigation."  Id. ¶ 15.

As part of the internal investigation, Carolyn Devenney, Zebra Strategies' Vice-President of Operations, "investigated the 'drive log' related to . . . Participant[ 1]'s file," which revealed that Participant 1's file "had been accessed by Nazarro [sic] without company authorization on numerous occasions."  Id. ¶ 16.  Further investigation also "revealed that Nazario had downloaded an overwhelming number of files at least thirty-nine (39) times over the course of

---

(Docket # 64) ("Goodman Mem."); Plaintiff's Response to Defendant Sean Goodman's Motion to Dismiss, filed Aug. 14, 2024 (Docket # 66) ("Pl. Opp. to Goodman"); Reply Memorandum of Law in Support of Motion to Dismiss, filed Aug. 21, 2024 (Docket # 67) ("Goodman Reply").

about five (5) months; which contained approximately twelve thousand (12,000) proprietary database contacts." Id. ¶ 17.  Gonzalez-Nazario's actions were "on [a] tremendous scale, harvesting the contact information for thousands of Zebra participants." Id. ¶ 18.  Gonzalez-Nazario did not have the "authority" to download or otherwise access such files.  Id. ¶ 36.

On October 31, 2023, "Participant 2," another individual who "signed up with and agreed to share private information with . . . Zebra Strategies, and only Zebra Strategies," contacted Zebra Strategies, "inquir[ing] . . . about a study she participated in [and] asking when she would receive payment." Id. ¶¶ 14 n.1, 21.  A "brief inquiry" revealed that "Participant 2 had not been contacted by Zebra and the study she participated in was not a Zebra study.  Instead, it was yet another study conducted by SAGO." Id. ¶ 22.  Zebra Strategies concluded that its "intellectual property and data was being stolen and sold to their competitors." Id. ¶ 23.  "Devenney immediately locked down all access to the database." Id.

On an unidentified date, Zebra Strategies "sent out a survey to their participants asking them if they were contacted by SAGO." Id. ¶ 27.  Of the "906 legitimate responses . . . multiple participants informed [Zebra Strategies] that they had been contacted by third parties with no idea how said parties obtained access to their data." Id.  Additionally, "[p]articipants themselves . . . provided emails to Zebra directly from AMR and SAGO indicating that they had somehow came [sic] to possess their personal information against their will." Id. ¶ 28.  Like SAGO, AMR is also "a marketing and research company," that is a "direct competitor[] of Zebra." Id. ¶¶ 5, 20.

 "[T]wenty-three (23) Zebra Participants were contacted directly by SAGO under the guise of 'following up on the Zebra survey.'" Id. ¶ 29.  Zebra Strategies also "signed up fictitious people as well as other people who never sign up for surveys to see if they would be

contacted, and they were by either AMR or SAGO." Id. ¶ 30.

Zebra Strategies "employ[ed] multiple cybersecurity firms to . . . investigate the breach." Id. ¶ 31. These firms informed Zebra Strategies that Zebra Strategies' "database had not been hacked, and that there was no evidence of any 'critical threats' to the database, nor was the stolen information being sold on the dark web." Id. The firms concluded that the "breach was an inside job, which involved a person or persons with access to the database illicitly providing access to Nazario." Id. ¶ 32. Zebra Strategies alleges that "the only individual[s] who had such access" to the database were Denine Rodney, the CEO of Zebra Strategies, Devenney, and Goodman. Id. ¶¶ 14, 32.

In January 2024, Zebra Strategies "distributed a survey to twelve thousand (12,000) plus contacts that Nazario downloaded. The survey asked the participants if they had been contacted by SAGO after participating in a Zebra study." Id. ¶ 34. "A third-party consultant contracted by Zebra found that a [sic] number of participants contacted by SAGO was 'dramatically high.'" Id. ¶ 35. Zebra Strategies subsequently "hired another cybersecurity firm to conduct a full and thorough investigation." Id.

"Devenney continued to investigate and audit Nazario's activity, and found that in addition to downloading thousands of database contacts, Nazario also accessed and stole pricing files, invoices and statements of work; all of which contained confidential participant information, and none of which Nazario had the authority to access, download, or sell," all "in clear breach of company policy and the parties [sic] Agreement." Id. ¶¶ 36, 37. The investigation also found that Gonzalez-Nazario "viewed some confidential files upwards of seven thousand (7,000) times, all while averaging a mere three (3) emails worth of work per day." Id. ¶ 38.

Zebra Strategies alleges that "[m]eanwhile, SAGO and AMR continued to use this information to solicit Zebra's participants and invite them to join studies, however they would often do so under pseudonyms such as 'FOCUS GROUP', 'FOCUS GROUP LLC', or a third-party company such as 'PRC MARKET RESEARCH.'" Id. ¶ 39.

An "expert forensics analysis conducted by a consultant" on an unspecified date "concluded that commercially sensitive data was accessed by Nazario which was not utilized for her work role." Id. ¶ 41. Zebra Strategies alleges that the "analysis also concluded that Goodman had deleted a plethora of files from his laptop and had deleted critical participant information such as names and dates of birth, rendering the Plaintiff's intellectual property worthless." Id. ¶ 42.

On an unidentified date, Gonzalez-Nazario and Goodman were interviewed about the breach. Id. ¶¶ 43, 44. Goodman "denied any wrongdoing . . . [and] falsely assure[d] . . . Rodney that she had nothing to be concerned about related to the theft of information and trade secrets." Id. ¶ 44. Gonzalez-Nazario also "denied wrongdoing and provided her personal laptop for further investigation." Id. ¶ 43. A subsequent "digital autopsy of the laptop . . . found it to be suspiciously clean of any files, given the fact that this laptop was used for work. It appeared obvious at this point that Nazario had wiped the laptop clean prior to the meeting." Id. ¶ 45. Gonzalez-Nazario was subsequently terminated. Id. ¶ 46. The date of the termination is not provided. Goodman resigned on March 29, 2024. Id. ¶ 47. No information is given as to how that date related to the dates of any of the other allegations regarding Goodman.

Zebra Strategies "estimate[s] that Nazario, with direct assistance from Goodman, downloaded over twenty thousand (20,000) participant names and their contact information which is the sole legal and intellectual property of Zebra." Id. ¶ 40. Zebra Strategies alleges that

"[a]t least three competitors of Zebra have accessed this information, including SAGO and [AMR], which was sold and/or provided to them directly by Nazario and Goodman." Id.  This data "contain[ed] Zebra's proprietary work product, not arbitrarily mined data from social media accounts of other publicly available information." Id. ¶ 24.  It "takes Zebra a tremendous amount of legwork, time, resources, and relationship building to gain the trust of the participants who share such sensitive information with Zebra." Id. ¶ 25.  Zebra alleges that this data "is not 'standard data', and includes demographics that few, if any competitors possess." Id. ¶ 26.  These demographics include "sexual orientation and gender identity, HIV status, current or past victims of domestic violence, substance abuse history, and numerous other data points that the average individual does not readily share or make available on the internet." Id. ¶ 26.  Zebra Strategies alleges that its "database, contacts, proprietary information, and trusted relationships with the communities that they target, serve, and provide a voice for; are sought after by both Fortune 100 companies and government agencies which creates a lucrative market for such information." Id. ¶ 49.

Zebra Strategies alleges that it "has been damaged both financially and in reputation by the actions of the defendants" and that its profits have taken "a sharp decline following this data breach." Id. ¶¶ 48, 53.  Specifically, "[t]he intellectual property stolen by Nazario and received by SAGO and [AMR], particularly the personal contact information of the participants . . . is valued at approximately $2.1M which is . . . $175[] per contact." Id. ¶ 48.

The Amended Complaint asserts the following causes of action: (1) theft of trade secrets under 18 U.S.C. § 1836 against all defendants, id. ¶¶ 55-63; (2) breach of contract against Gonzalez-Nazario and Goodman, id. ¶¶ 64-78; (3) conversion against Gonzalez-Nazario and Goodman, id. ¶¶ 79-81; (4) breach of duty of loyalty against Gonzalez-Nazario and Goodman,

id. ¶¶ 82-85; (5) civil conspiracy against all defendants, id. ¶¶ 86-90; and (6)[2] unfair competition

against SAGO and AMR, id. ¶¶ 91-92.

## II. LEGAL STANDARD

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) when the opposing

party's complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P.

12(b)(6).  While a court must accept as true all of the factual allegations contained in a

complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do.")

(punctuation, citation, and alterations omitted).  In other words, "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal,

556 U.S. at 678 (citation omitted), and a court's first task is to disregard any conclusory

statements in a complaint, id. at 679.

Next, a court must determine if the complaint contains "sufficient factual matter" which,

when accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and

punctuation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  Id. (internal citation and

punctuation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than

---

[2]  While the complaint numbers this cause of action as "7," we identify it as the sixth
cause of action because the numbering of the causes of action skips from 5 to 7.

the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a)

because it has merely "alleged" but not "'show[n]'—'that the pleader is entitled to relief.'" Id. at

679 (quoting Fed. R. Civ. P. 8(a)(2)).

III.  DISCUSSION

AMR, Goodman, and Gonzalez-Nazario have moved to dismiss each of Zebra Strategies'

causes of action relating to them.  We address each cause of action next.

A.  Theft of Trade Secrets

AMR, Goodman, and Gonzalez-Nazario seek dismissal of Zebra Strategies' claim under

the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839.  The DTSA provides that

"[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade

secret is related to a product or service used in, or intended for use in, interstate or foreign

commerce."  18 U.S.C. § 1836(b)(1).  18 U.S.C. § 1839 defines "misappropriation" as

> (A) acquisition of a trade secret of another by a person who knows or has reason to
> know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent
> by a person who—
>> (i) used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that the
>> knowledge of the trade secret was—
>>> (I)  derived from or through a person who had used improper means to acquire
>>> the trade secret;
>>> (II)  acquired under circumstances giving rise to a duty to maintain the secrecy
>>> of the trade secret or limit the use of the trade secret; or
>>> (III) derived from or through a person who owed a duty to the person seeking
>>> relief to maintain the secrecy of the trade secret or limit the use of the
>>> trade secret; or
>> (iii) before a material change of the position of the person, knew or had reason to
>> know that—
>>> (I)  the trade secret was a trade secret; and
>>> (II)  knowledge of the trade secret had been acquired by accident or mistake

18 U.S.C. § 1839(5).  Case law has summarized this definition as follows:

> an unconsented disclosure or use of a trade secret by one who (i) used improper
> means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason

to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.

Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc., 2016 WL 5338550, at *6

(S.D.N.Y. Sept. 23, 2016); accord Elsevier Inc. v. Dr. Evidence, LLC, 2018 WL 557906, at *3

(S.D.N.Y. Jan. 23, 2018).[3]

The defendants argue that the DTSA claim fails for two reasons: (1) because the information at issue is not a trade secret, see Goodman Mem. at 4-9; AMR Mem. at 5-8, and (2) because there has been no showing of "misappropriation," see Goodman Mem. at 9; AMR Mem. at 8.  We address each argument separately.

1.  Whether the Information is a "Trade Secret"

The DTSA's definition of "trade secret" is as follows:

[T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).

"[T]here is no heightened pleading requirement on actions brought under the DTSA."

Tesla Wall Sys., LLC v. Related Cos., L.P., 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017)

(citation omitted).  Nonetheless, a claimant under the DTSA "bears the burden of identifying a purported trade secret with sufficient specificity."  Syntel Sterling Best Shores Mauritius Ltd. v.

---

[3]  The briefs for Goodman and AMR quote this summary, but miscite section 1836 as its source.  See Goodman Mem. at 4; AMR Mem. at 5-6.

The TriZetto Grp., Inc., 68 F.4th 792, 800 (2d Cir. 2023); accord Next Commc'ns, Inc. v. Viber Media, Inc., 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) (trade secret claimant must "describe the secret with sufficient specificity that its protectability can be assessed") (emphasis in original) (citation omitted).  While the Second Circuit has "decline[d]" to "squarely articulate[] the precise contours of the specificity requirement in the context of trade secrets," Syntel Sterling Best Shores Mauritius Ltd., 68 F.4th at 800 n.9 (citation omitted), it has articulated that the purpose of the specificity requirement is to "'place[] a defendant on notice of the bases for the claim being made against it,' and allow[] a factfinder to determine whether certain information is, in fact, a trade secret." Id. at 801 (citations omitted).  As one court has noted, "[w]hile it is not necessary to disclose every detail of an alleged trade secret in a complaint, the pleading standard set forth in Twombly and Iqbal requires that the complaint allege facts sufficient to identify the information for which protection is claimed and sufficient information about its nature, value, and measures taken to safeguard it to support an inference that the information qualifies as a trade secret."  Universal Processing LLC v. Weile Zhuang, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (granting a motion to dismiss for failing to allege a trade secret); accord Intrepid Fin. Partners, LLC v. Fernandez, 2020 WL 7774478, at *4-5 (S.D.N.Y. Dec. 30, 2020) (granting a motion to dismiss for failing to allege a trade secret).  As these cases demonstrate, courts routinely dismiss DTSA claims for failing to sufficiently allege a trade secret.  Accordingly, we reject plaintiff's argument that the question of whether the complaint alleges a trade secret "is not ripe for review upon a motion to dismiss" because it is a "question of fact" that can only be determined by "the trier of fact."  Pl. Opp. to AMR at 4 (emphasis in original) (citation omitted).

In assessing whether a trade secret has been alleged in the context of a claim arising under the DTSA, courts commonly consider the following factors:

(1) the extent to which the information is known outside of the business;
(2) the extent to which it is known by employees and others involved in the business;
(3) the extent of measures taken by the business to guard the secrecy of the information;
(4) the value of the information to the business and its competitors;
(5) the amount of effort or money expended by the business in developing the information; [and]
(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Universal Processing LLC, 2018 WL 4684115, at *3 (modification in original); accord Elsevier Inc., 2018 WL 557906, at *3-4 (applying this analysis to determine whether a trade secret exists under the DTSA); In re Document Techs. Litig., 275 F. Supp. 3d 454, 462 (S.D.N.Y. 2017) (same).  These factors derive from commentary in the Restatement of Torts relating to common law disclosure of trade secrets, see Restatement of Torts § 757, comment b ---  factors that, although not explicitly referenced by the DTSA, appropriately address the two necessary criteria set forth in the DTSA's definition of trade secrets: the "reasonable[ness]" of the measures taken to keep the information secret and whether the information derives value from not being "generally known."  18 U.S.C. § 1839(3)(A)-(B).

While it takes some piecing together of the allegations of the complaint to determine what information is alleged to be a trade secret, we can glean that the information at issue is "demographic data" contained in a "database of participant information which contain [sic] sensitive and personal information about the participants."  Am. Compl. at 1.  The "participants" are sometimes referred to as "database contacts."  Id. ¶¶ 17, 36.  The participants each appear to have a "file."  Id. ¶ 16.  That file contains "[d]emographics such as sexual orientation and gender identity, HIV status, current or past victims of domestic violence, substance abuse history, and

numerous other data points that the average individual does not readily share or make available on the internet." Id. ¶ 26. This information "is not 'standard data', and includes demographics that few, if any competitors possess." Id.

While the complaint is not a model of clarity on the trade secret issue, its allegations cross the minimal threshold requirements of pleading a trade secret. First, a database used in the business of a market research and strategy firm, see id. ¶ 1, is "business information," § 1839(3).

As to the value of the information, the extent to which it is known outside the business, and the amount of effort expended in developing the information, see Universal Processing LLC, 2018 WL 4684115, at *3, Zebra Strategies has alleged that this data is "proprietary work product, not arbitrarily mined data from social media accounts of other publicly available information," that it "takes Zebra a tremendous amount of legwork, time, resources, and relationship building to gain the trust of the participants who share such sensitive information with Zebra," and that the data is "sought after by both Fortune 100 companies and government agencies which creates a lucrative market for such information." Am. Compl. ¶¶ 24, 25, 49.

As to the ease or difficulty with which the information could be properly acquired or duplicated by others, see Universal Processing LLC, 2018 WL 4684115, at *3 (considering this factor to determine whether information fits the definition of trade secret under the DTSA); 18 U.S.C. § 1839(3)(B) (information is a trade secret if "the information derives independent economic value . . . from . . . not being readily ascertainable through proper means by[] another person"), Zebra Strategies alleges that the data "is not 'standard data', and includes demographics that few, if any competitors possess," Am. Compl. ¶ 26.

Lastly, as to the measures taken to guard the secrecy of this information and the extent to which the information was known by employees involved in the business, see Universal

Processing LLC, 2018 WL 4684115, at *3, Zebra Strategies "contracted with a third-party vendor called VOXCO in order to secure th[e] database by licensing access to VOXCO's platform," Am. Compl. at 1-2, Zebra Strategies limited access to the database to three employees, id. ¶ 32, and reacted promptly and comprehensively upon suspecting a data breach, see, e.g., id. ¶¶ 23-46 (detailing the steps taken by Zebra Strategies in reaction to the alleged theft and sale of information).

Accordingly, the complaint alleges facts which "support an inference that the information qualifies as a trade secret," Universal Processing LLC, 2018 WL 4684115, at *3.

Defendants rely heavily on Intrepid Fin. Partners, LLC, see AMR Mem. at 7-8; Goodman Mem. at 7-8, which dismissed a DTSA claim in part for failing to allege facts supporting an inference that information relating to clients and business operations were trade secrets. See Intrepid Fin. Partners, LLC, 2020 WL 7774478, at *3-4. In that case, however, the complaint merely "reference[d] categories of information concerning its clients and ordinary business operations" and only "conclusorily allege[d] that such information [was] not readily available and afforded [the plaintiff] economic value." Id. at *4. Here, by contrast, Zebra Strategies alleges that the information includes highly personal demographic data as to each "participant" that "the average individual does not readily share" and that to obtain such information, Zebra Strategies had to expend "a tremendous amount of legwork, time, resources, and relationship building to gain the trust of the participants" in order to get them to share "such sensitive information with Zebra." Am. Compl. ¶¶ 25, 26. Thus, the complaint's description of the information at issue is not merely a "reference[ to a] categor[y] of information concerning [plaintiff's] clients and ordinary business operations," see Intrepid Fin. Partners, LLC, 2020 WL 7774478, at *4, but instead consists of detailed and personal information about individuals that

are of a highly personal nature and thus can logically be assumed to be rarely shared with outsiders.  Such information, which "required substantial time, effort and money to compile may be deemed a trade secret where," as here, "it contains information that is not readily available." Id. at *3.

### 2.  Misappropriation

Defendants argue that Zebra Strategies' "DTSA claim should be dismissed for failure to allege facts demonstrating plausibly that [defendants] misappropriated any trade secret."  AMR Mem. at 8; see also Goodman Mem. at 9 ("the Amended Complaint lacks allegations demonstrating that Goodman [and, by adoption, Gonzalez-Nazario] misappropriated anything").  We address the three moving defendants separately.

### a.  AMR

The allegations as to misappropriation by AMR are disjointed and difficult to follow. While there are numerous conclusory references to AMR misappropriating data of Zebra Strategies' participants, see Am. Compl. ¶¶ 40, 50, 51, 52, 58, 59, 89, 90, 92, the complaint does not show through any non-conclusory allegations that AMR misappropriated Zebra Strategies' data.

First, there are no non-conclusory factual allegations showing that any of Zebra Strategies' data was actually given to AMR.  Nor are there any non-conclusory allegations showing that Goodman or Gonzalez-Nazario ever worked for AMR or had any other relationship or contact with AMR.

Second, there are no non-conclusory allegations showing that AMR was in possession of data that was exclusively in the possession of Zebra Strategies or that the data used by AMR was in a form indicating that it had come from Zebra Strategies.

Putting aside the relatively detailed allegations against SAGO, which are much more expansive than those against AMR, the complaint alleges only the following conduct by AMR:

(1)  Some participants provided emails from AMR "indicating" that both AMR and Sago "had somehow came [sic] to possess their personal information."  Am. Compl. ¶ 28.  This allegation says nothing about what facts showed that AMR "came to possess" that information or what sort of information was involved.  It is thus conclusory.

(2)  Zebra Strategies "signed up fictitious people as well as other people who never sign up for surveys to see if they would be contacted, and they were by either AMR or SAGO."  Id. ¶ 30.  This allegation is so lacking in detail or explanation as to be nearly incomprehensible.  The complaint provides no explanation of the meaning of this allegation, including for example, when and how Zebra Strategies signed up fictitious people, whether there was contact from both AMR and SAGO or just one of them, what the nature of that contact was, whether that contact was with "fictitious" people or "other" people, and when, in relation to the signing-up, the contact from AMR or SAGO occurred.

As to "people who never sign up for surveys," the allegation is unsupported by any facts showing how it could be determined that certain specific people do not "sign up for surveys." Further, as to the allegation regarding "fictitious people," perhaps Zebra Strategies means to allege that Zebra Strategies created data entries of fake customers in its own system who were contacted at some later point.  But the complaint does not allege this explicitly and the allegation is simply too unclear for the Court to draw that inference.  Additionally, given the compound nature of the allegations in the paragraph — referring to both "fictitious" people and "people who never sign up for surveys" and identifying AMR and SAGO in the disjunctive — it cannot

be construed as an allegation showing that AMR solicited fictitious persons that had been created by Zebra Strategies and that resided exclusively in Zebra Strategies' database.

(3)  AMR took "affirmative steps" to "conceal" its identity by using a pseudonym such as "FOCUS GROUP" or "FOCUS GROUP LLC" to "throw the Plaintiff off as to the fact that they had illegal access to intellectual property and proprietary data." Id. ¶¶ 39, 51.  However, the mere fact that a marketing and research company operates under more than one name provides no indication that the company is seeking to conceal the unauthorized use of data.

Plaintiff's brief in response to AMR's motion does little to explain why the allegations of the complaint are sufficient.  Plaintiff does fault AMR because it "Does Not Deny Possessing The Data At Issue" and argues that "[t]his omission is extremely concerning and telling."  Pl. Opp. to AMR at 6, 7.  But it would have been improper for AMR to deny possessing the data — or to make any other factual allegations — in opposing a motion to dismiss.  Instead, the burden is on the plaintiff to demonstrate why the allegations of the complaint "show[]" that plaintiff is "entitled to relief." Iqbal, 556 U.S.at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Far from showing that AMR misappropriated data, the complaint shows, at best, the mere possibility of misconduct by AMR.  As the Supreme Court has held, where the allegations of a pleading "do not permit the court to infer more than the mere possibility of misconduct," the complaint is insufficient and must be dismissed.  Id.

   b. Gonzalez-Nazario

The complaint does make sufficient non-conclusory allegations that "allow[] the court to draw the reasonable inference that" Gonzalez-Nazario misappropriated Zebra Strategies' database. Id. at 678. Zebra Strategies alleges that the "'drive log' related to Participant[ 1]'s file . . . revealed that the file had been accessed by Nazarro [sic] without company authorization on

numerous occasions," and that Participant 1 was later contacted by SAGO, that Gonzalez-Nazario "had downloaded an overwhelming number of files at least thirty-nine (39) times over the course of about five (5) months; which contained approximately twelve thousand (12,000) proprietary database contacts," that an investigation by multiple cybersecurity firms made clear that the database "had not been hacked," that Gonzalez-Nazario had accessed and downloaded a number of files containing participant information which she did not have the authority to access or download, and that Gonzalez-Nazario "wiped [a] laptop [that was used for work] clean prior to" providing the laptop for investigation. Am. Compl. ¶¶ 14, 16, 17, 31, 36, 45. When these allegations are considered alongside the non-conclusory allegation that SAGO had contacted participants "under the guise of 'following up on [a] Zebra survey,'" id. ¶ 29, the allegations are sufficient to support the inference that Gonzalez-Nazario improperly acquired participant information and disclosed it to SAGO.

> c. Goodman

There are no non-conclusory allegations that Goodman misappropriated any files. There is an allegation that Goodman provided Gonzalez-Nazario with "access" to "files" containing trade secrets, Am. Compl. ¶ 19 — but this allegation is conclusory for the reasons set forth in section III.D below. Even assuming arguendo that the complaint showed that Goodman had provided Gonzalez-Nazario with the means to access files in the database, merely providing an individual with the means to access files that contain trade secrets does not come within the DTSA's definition of "misappropriation." Rather, the DTSA defines misappropriation as the "acquisition" or the "disclosure or use" of a trade secret. 18 U.S.C. § 1839(5)(A)-(B). Even if the complaint showed that Goodman provided Gonzalez-Nazario with the means to access the

database, this conduct would not come within the statute because it would not mean that Goodman actually engaged in the "acquisition," "disclosure," or "use" of trade secrets himself.

That Gonzalez-Nazario was purportedly enabled by Goodman (through access Goodman provided) to misappropriate trade secrets herself would not change the analysis. "Generally, courts have held that . . . conspiracy or secondary liability under the DTSA is not available as a private right of action, and thus a plaintiff must show 'that each defendant individually misappropriated at least one trade secret.'" Hedgeye Risk Mgmt., LLC v. Dale, 2023 WL 6386845, at *7 (S.D.N.Y. Sept. 29, 2023) (collecting cases). In other words, there is no private cause of action under the DTSA for aiding and abetting misappropriation of trade secrets. See, e.g., Credit Sage LLC v. Credit Wellness LLC, 2024 WL 99474, at *10 (D. Wyo. Jan. 9, 2024) (agreeing that "'aiding and abetting misappropriation of trade secrets' . . . is not a private cause of action recognized under federal law"); Power Home Solar, LLC v. Sigora Solar, LLC, 2021 WL 3856459, at *10 (W.D. Va. Aug. 30, 2021) ("aiding and abetting the theft of trade secrets is not a cognizable right of action under the DTSA").

In sum, the DTSA claim against Goodman fails because the complaint does not show that he "misappropriated" any information within the meaning of the statute.

B. Breach of Contract

The complaint alleges that Gonzalez-Nazario and Goodman breached their confidentiality agreements, which prohibit employees from disclosing "Confidential Information" to "any entity or person whatsoever" and from "copying any . . . files . . . containing any Confidential Information." Am. Compl. ¶¶ 67, 68. The agreement requires employees to "hold the Confidential Information in strict confidence." Id. ¶ 69. With respect to

Gonzalez-Nazario, the complaint alleges that she is in breach of provisions that promote "noncompetition" and forbid "solicitation of Zebra . . . participants."  Id. ¶¶ 71, 72.

The complaint also states that Gonzalez-Nazario and Goodman are in breach of the employee handbook, which they are alleged to have both signed.  Id. ¶¶ 73, 74.  The handbook, which is not attached to the complaint, allegedly requires employees to "agree[] to safeguard Zebra's confidential information, to exercise 'caution and discretion' whenever accessing sensitive participant information, and not to never [sic] disclose this information to any third-party without express approval from Zebra."  Id.  "The Handbook also explicitly states that 'Confidential Information obtained as a result of employment with the Company is not to be used for personal gain."  Id. ¶ 75.

"To state a claim for breach of contract under New York law, [a plaintiff] must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  Edwards v. Sequoia Fund, Inc., 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).

For the reasons stated above, see Section III.A, the complaint states a claim as to Gonzalez-Nazario.  As discussed, there are non-conclusory allegations that Gonzalez-Nazario intentionally disseminated Zebra Strategies' information to a third party, SAGO.

As for Goodman, Goodman's brief argued that Zebra Strategies' breach of contract claim "fails to allege how Goodman purported [sic] breached the confidentiality agreement."  Goodman Mem. at 9.  Plaintiff responded by asserting that Goodman has not met his "burden of proving as a matter of law that he did not breach the contract."  Pl. Opp to Goodman at 9.  This argument is frivolous because Goodman has no burden to disprove plaintiff's claims.

"In this Circuit and in New York State, Courts have held that the plaintiff must at least have alleged which provisions of a contract were breached in order to survive a motion to dismiss on a breach of contract claim." Zucker v. HSBC Bank, USA, N.A., 2022 WL 16755604, at *11 (E.D.N.Y. Aug. 1, 2022) (citing authorities), adopted by 2022 WL 16549134 (E.D.N.Y. Oct. 31, 2022); accord Pierce Coach Line, Inc. v. Port Wash. Union Free Sch. Dist., 185 N.Y.S.3d 187, 189-90 (App. Div. 2023) ("To state a cause of action to recover damages for a breach of contract, the plaintiff's allegations must identify the provisions of the contract that were breached.").

In its opposition to Goodman's motion, Zebra Strategies specifies that Goodman breached the contract because he "allowed third-party access to [the database] for the economic benefit of himself, and said third-party(s)." Pl. Opp. to Goodman at 9. The problem here is that the complaint provides no non-conclusory allegations showing that Goodman disseminated any confidential information to a "third party" for the reasons stated previously. See Section III.A. Even assuming arguendo that the complaint showed that Goodman provided Gonzalez-Nazario with access to the database, plaintiff has not stated a claim for breach of contract as to Goodman because the term "third-party" cannot plausibly be read to refer to other employees of Zebra Strategies. The confidentiality agreement annexed to the complaint specifically excepts "other employees of the Company" from its scope. See "Zebra Strategies Inc. Confidentiality Agreement," annexed as Ex. 2 to Am. Compl. (Docket # 53-2), § 2.A. And the complaint uniformly uses the term "third party" to refer to parties outside of Zebra Strategies. See, e.g., Am. Compl. ¶¶ 14, 27, 35, 39.

Finally, even if the confidentiality agreement could be read to prohibit Goodman from providing Gonzalez-Nazario with access to the database, the breach of contract claim would still

fail because there are no non-conclusory allegations that Goodman in fact provided such access

for the reasons stated in Section III.D below.

C. Conversion

The complaint asserts a claim of conversion against Goodman and Gonzalez-Nazario on

the ground that they "assumed control over the Plaintiff's property, direct [sic] interfering with

their right of possession, and in derogation of Plaintiff's proprietary rights to the participant

data." Am. Compl. ¶ 80.

The Second Circuit has summarized New York law of conversion as follows:

> According to New York law, "[c]onversion is the unauthorized assumption and
> exercise of the right of ownership over goods belonging to another to the
> exclusion of the owner's rights." This includes a "denial or violation of the
> plaintiff's dominion, rights, or possession" over her property. It also requires that
> the defendant exclude the owner from exercising her rights over the goods.

Thyroff v. Nationwide Mut. Ins., 460 F.3d 400, 403-04 (2d Cir. 2006) (alteration in original)

(emphasis added) (citations omitted). "[W]here possession of property is initially lawful,

conversion occurs when there is a refusal to return the property upon demand." Salatino v.

Salatino, 64 A.D.3d 923, 925 (N.Y. App. Div. 2009) (citations omitted). "Returning property to

the rightful owner does not absolve defendants of all liability from the alleged conversion," and a

claim "will exist even when the deprivation is partial or temporary." Okyere v. Palisades

Collection, LLC, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) (discussing New York conversion

law) (citations and ellipses omitted). The New York Court of Appeals has held that "electronic

records that [a]re stored on a computer and [a]re indistinguishable from printed documents" are

the sort of property that is subject to a claim of conversion. Thyroff v. Nationwide Mut. Ins., 8

N.Y.3d 283, 292-93 (2007); accord Apple Mortg. Corp. v. Barenblatt, 162 F. Supp. 3d 270, 284

(S.D.N.Y. 2016).

Goodman argues that Zebra Strategies' conversion claim fails because Zebra Strategies "does not allege that [Goodman] exercised control over Plaintiff's alleged trade secrets to the exclusion of Plaintiff. Nor can Plaintiff as Plaintiff expressly alleges it maintained control over the database since it locked down access to it after learning of the supposed breach." Goodman Mem. at 10 (citing Am. Compl. ¶ 23). Zebra Strategies responds that Goodman's argument "has no foundation and is again made in bad faith [because] Goodman had full access and control of the database, as he was the database administrator." Pl. Opp. to Goodman at 9. But having access and control is not sufficient to show conversion under New York law, which requires also "that the defendant exclude the owner from exercising her rights over the goods." Thyroff, 460 F.3d at 404 (citation omitted). Because Zebra Strategies makes no argument that the complaint shows that it was deprived of the use of files by Goodman or by Gonzalez-Nazario, the complaint does not state a conversion claim.[4] Moreover, any claim that plaintiff did not have access to its own data is belied by the allegation made specifically in support of the conversion claim which alleges only that the defendants "assumed control over the Plaintiff's property" and makes no assertion that it was unable to access that property. Am. Compl. ¶ 80.

This conclusion is supported by case law. For example, Reis, Inc. v. Spring11 LLC, 2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016), held that the unauthorized download of files was not conversion because the plaintiff was never deprived of access. Id. at *10-11. As Reis noted, "[w]hile New York courts have recognized that conversion can be predicated on the loss of

---

[4] Zebra Strategies' opposition to Goodman's arguments on dismissing the conversion claim, see Pl. Opp. to Goodman at 9-10, understandably does not rely on the complaint's vague and unexplained allegation that Goodman at one point "deleted critical participant information such as names and dates of birth, rendering the Plaintiff's intellectual property worthless." Am. Compl. ¶ 42. Given the vagueness of this allegation, devoid of any explanation or description of the circumstances or timing of such deletion, it fails to sufficiently allege that Goodman is liable for conversion.

intangible electronic data, that case law has not altered the traditional rule requiring the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." Id. at *10 (alterations, punctuations, and citations omitted); accord Kim v. Lee, 576 F. Supp. 3d 14, 33 (S.D.N.Y. 2021) ("a conversion claim does not lie where the defendant's copying of electronic files containing confidential and proprietary information is not to the exclusion of the rights of the owner") (citations omitted); Fischkoff v. Iovance Biotherapeutics, Inc., 339 F. Supp. 3d 408, 414-15 (S.D.N.Y. 2018) (no conversion where the plaintiff was not denied use of original computer files). Thus, the Court dismisses this count.

D. Breach of Duty of Loyalty

Goodman moved to dismiss the claim for breach of duty of loyalty. While his argument was brief, see Goodman Mem. at 10, it was presented in his memorandum of law as a separate part, as required by Local Civil Rule 7.1(a)(2).

Zebra Strategies' memorandum of law in opposition, however, contained no separate part devoted to justifying this claim, mentioning the concept of "loyalty" only once in passing. See Pl. Opp. to Goodman at 10. Thus, Zebra Strategies did not address the claim and thereby did not "set[] forth the cases and other authorities relied on in support of the motion," as required by Local Civil Rule 7.1(a)(4) (incorporating Local Civil Rule 7.1(a)(2)). A fortiori, Zebra Strategies did not even purport to explain the elements of the claim or argue why the complaint met each of those elements. Zebra Strategies' failure to address the claim in any meaningful way, and in the manner required by Local Civil Rule 7.1(a)(2), means that it has effectively abandoned this claim. See, e.g., Verdi v. City of New York, 306 F. Supp. 3d 532, 552 (S.D.N.Y. 2018) (where the plaintiff "did not respond to [the defendant's] arguments in his opposition . . . [the p]laintiff abandoned his . . . claims," and, thus, the claims would be "dismissed with

prejudice"); McLeod v. Verizon N.Y., Inc., 995 F. Supp. 2d 134, 143 (E.D.N.Y. 2014) ("Indeed,

courts in [the Second Circuit] have held that '[a] plaintiff's failure to respond to contentions

raised in a motion to dismiss claims constitute an abandonment of those claims.'") (alteration in

original) (quoting Youmans v. Schriro, 2013 WL 6284422, at *5 (S.D.N.Y. Dec. 3, 2013));

Brandon v. City of New York, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (claims abandoned

when a plaintiff fails to address the defendants' arguments) (collecting cases); Anti–Monopoly,

Inc., v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[U]nder New York state law,

the failure to provide argument on a point at issue constitutes abandonment of the issue."), aff'd,

130 F.3d 1101 (2d Cir. 1997) (per curiam).  Thus, we deem the claim abandoned as to both

Goodman and Gonzalez-Nazario.

     Even if we were to consider the merits of the motion to dismiss as to this claim, we

would find that the complaint does not state a claim of breach of duty of loyalty as to Goodman.

     "Under New York law, an employee owes a duty of good faith and loyalty to his

employer."  Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005)

(citations omitted), aff'd, 469 F.3d 284 (2d Cir. 2006).  New York courts have "applied the same

standards for determining a breach of duty of loyalty claim to a breach of fiduciary duty claim

against an employee."  Bluebanana Grp. v. Sargent, 107 N.Y.S.3d 667, 667 (App. Div. 2019)

(citation omitted).  "To establish a breach of fiduciary duty, the movant must prove the existence

of a fiduciary relationship, misconduct by the other party, and damages directly caused by that

party's misconduct."  Pokoik v. Pokoik, 982 N.Y.S.2d 67, 70 (App. Div. 2014) (citation

omitted).

     Here, the portion of the complaint alleging breach of duty of loyalty alleges that

Goodman and Gonzalez-Nazario "profited from the theft of trade secrets that belonged to the

Plaintiff."  Am. Compl. ¶ 83; accord id. ¶ 84 ("the profits earned by the defendants were the result of their theft of trade secrets"); id ¶ 85 (Goodman and Gonzalez-Nazario "made profit [sic] and received benefits in connection their part [sic] in the theft of Plaintiff's trade secrets").

With respect to Gonzalez-Nazario, the complaint adequately alleges that she engaged in the "theft of trade secrets."  Gonzalez-Nazario makes no other argument regarding the infirmity of this claim.  Thus, if it were not for the abandonment of the claim, we would have allowed it to proceed.

With respect to Goodman, however, the claim fails not only because it was abandoned but also because the complaint fails to show with non-conclusory allegations that Goodman engaged in any "theft of trade secrets" as set forth in paragraphs 83 to 85 of the complaint.  See Section III.A above.  To the extent plaintiff is asserting that Goodman providing Gonzalez-Nazario with access to the database constituted the "misconduct" that forms the basis of the breach of duty of loyalty, the complaint fails to show that Goodman provided such access. Instead, the complaint at best allows only for the "possibility" that Goodman provided Gonzalez-Nazario with access to the database, which is insufficient to state a claim. Iqbal, 556 U.S. at 679.

The allegations against Goodman are relatively sparse compared with those involving Gonzalez-Nazario and SAGO.  Certainly, the fact that Goodman was one of only three people who had access to the database creates suspicion that Goodman could have provided Gonzalez-Nazario with access.  See Am. Compl. ¶ 32.  There is also perhaps some marginal importance that may be attached to the fact that Goodman resigned, though there is no indication as to the timing of that resignation in relation to the investigation of the data breach or Gonzalez-Nazario's own resignation.  See id. ¶ 47.

The allegations, however, are not sufficient to show that Goodman provided Gonzalez-

Nazario with access such that it amounts to "misconduct" constituting a breach of duty of loyalty. The only other allegation in the complaint that casts suspicion on Goodman is the allegation that "Goodman had deleted a plethora of files from his laptop and had deleted critical participant information such as names and dates of birth, rendering the Plaintiff's intellectual property worthless." Id. ¶ 42. However, as noted previously, see footnote 4, this allegation is devoid of any context — such as the circumstances or dates of the deletion or any other explanation.

To be sure, Zebra Strategies had a reason to suspect that Goodman provided Gonzalez-Nazario with access and the allegations show that there was a possibility that Goodman did so. Neither suspicion nor a possibility, however, is sufficient to state a claim under the Twombly/Iqbal standard. See Twombly, 550 U.S. at 555 ("The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action") (citation, alteration brackets, and ellipses omitted); Iqbal, 556 U.S. at 679 (where the allegations of a pleading "do not permit the court to infer more than the mere possibility of misconduct," the complaint is insufficient and must be dismissed).

E. Unfair Competition

The complaint asserts an unfair competition claim against AMR. Am. Compl. ¶¶ 91-92. It alleges that AMR "knew [it was] receiving proprietary trade secrets from a direct competitor" but nonetheless "transacted for the data and proceeded to use it in an attempt to destroy the Plaintiff's business." Id. at ¶ 92.

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential

relationship." <u>Telecom Int'l Am., Ltd. v. AT & T Corp.</u>, 280 F.3d 175, 197 (2d Cir. 2001) (citation omitted).  Thus, "[t]o state a claim for unfair competition" under New York law, "a plaintiff must allege that a defendant misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so." <u>Data Device Corp. v. W.G. Holt, Inc.</u>, 2020 WL 7024312, at *6 (E.D.N.Y. Nov. 30, 2020) (citation omitted).  However, as discussed above, <u>see</u> Section III.A, the complaint fails to show that AMR "misappropriated" anything of Zebra Strategies.  Thus, the unfair competition claim fails as against AMR.

    F.  <u>Civil Conspiracy</u>

The only civil conspiracy claim alleged in the complaint is that "each of the[] defendants conspired with one another to violate 18 U.S.C § 1836."  Am. Compl. ¶ 87.  As already noted, "[g]enerally, courts have held that that . . . conspiracy or secondary liability under the DTSA is not available as a private right of action, and thus a plaintiff must show 'that each defendant individually misappropriated at least one trade secret.'" <u>Hedgeye Risk Mgmt., LLC</u>, 2023 WL 6386845, at *7 (collecting cases).  Because the civil conspiracy claim is asserted only as to the DTSA, which does not support such claims, the claim fails as to all defendants.

Conclusion

For the foregoing reasons, AMR and Goodman's motions to dismiss (Docket ## 59, 63) are granted.  Gonzalez-Nazario's motion to dismiss (Docket # 70) is denied except with respect to the claim of breach of duty of loyalty and civil conspiracy.

SO ORDERED.

Dated: January 31, 2025
         New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge